IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-983

Filed 9 December 2025

Orange County, No. 19CVS001604-670

TASHA L. JONES and THOMAS O. JONES, Plaintiffs,

v.

MICHAEL R. MILL, MD, in his individual capacity; PAMELA RO, MD, in her individual capacity; and JOHN DOE 1-5, in his/her individual capacity, Defendants.

Appeal by plaintiffs from order entered 23 July 2024 by Judge Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 11 June 2025.

*The Lile-King Firm, by Phyllis Lile-King, and Brown, Moore & Associates, PLLC, by Jon R. Moore and Matthew Berthold, for plaintiffs-appellants.*

*Robinson, Bradshaw & Hinson, P.A., by Matthew W. Sawchak and Erik R. Zimmerman, for defendants-appellees Michael R. Mill, M.D., and Pamela Ro, M.D.; Walker Allen, LLP, by Barry S. Cobb and Dennis W. Dorsey, for defendant-appellee Michael R. Mill, M.D.; and Huff Powell & Bailey, PLLC, by Pankaj K. Shere, Katherine Hilkey-Boyatt, and Rachel Samuelson, for defendant-appellee Pamela Ro, M.D.*

*No brief filed on behalf of defendants-appellees John Doe 1-5.*

*Tatum & Atkinson, PLLC, by Jon Ward, and Miller Law Group, PLLC, by MaryAnne M. Hamilton, for amicus curiae North Carolina Advocates for Justice in support of plaintiffs-appellants.*

*Ellis & Winters LLP, by Michelle A. Liguori, Madeleine M. Pfefferle, and David A. Keirstead, for amicus curiae North Carolina Association of Defense Attorneys in support of defendants-appellees.*

*Michael Best & Friedrich LLP, by Justin G. May, Carrie E. Meigs, and Matthew B. Couch, for amici curiae North Carolina Healthcare Association, North Carolina Medical Society, American Medical Association, North Carolina*

*Health Care Facilities Association, North Carolina Assisted Living Association & North Carolina Senior Living Association in support of defendants-appellees.*

ZACHARY, Judge.

Plaintiffs Tasha L. Jones and Thomas O. Jones appeal from the trial court's order granting the motions for summary judgment filed by Defendants Michael R. Mill, M.D., and Pamela Ro, M.D. After careful review, we affirm.

## I.    Background

This case arises from the death of Plaintiffs' daughter Skylar as a result of complications following cardiac surgery. In 2013, pediatric cardiologists diagnosed Skylar with an atrial septal defect. Doctors informed Plaintiffs that Skylar's condition may eventually require surgery.

In 2016, Skylar presented to UNC Children's Hospital, where she was seen by Dr. Ro. Dr. Ro referred Plaintiffs to Dr. Mill, director of the Pediatric Cardiac Surgery ("PCS") program at UNC Children's Hospital. Dr. Mill discussed with Plaintiffs the anticipated procedure as well as "the risks and benefits and alternatives," including "data related to the operation that was proposed." The Society of Thoracic Surgeons ("STS") categorizes congenital cardiothoracic operations into five "STAT" categories, with Level 1 procedures being the least complex and Level 5 the most complex. The procedure that Skylar was believed to require—repair of an atrial septal defect—is categorized as a STAT Level 1 procedure. Plaintiffs opted to proceed with the surgery.

During the procedure, however, Dr. Mill discovered that Skylar's initial diagnosis was incorrect: she had an unroofed coronary sinus, a rare condition that required a more complex procedure, which Dr. Mill performed. The night after surgery, Skylar developed complications that ultimately required her to remain in the hospital for two months. During that period, Skylar was placed on and taken off of life-support several times and had further surgical procedures. On 30 July 2016, Skylar died.

On 31 May 2019, the New York Times published an article about the PCS program at UNC Children's Hospital that featured Plaintiffs. *See* Ellen Gabler, *Doctors Were Alarmed: 'Would I Have My Children Have Surgery Here?'*, N.Y. Times (May 31, 2019), https://www.nytimes.com/interactive/2019/05/30/us/children-heart-surgery-cardiac.html. The article discussed, *inter alia*, concerns about Dr. Mill and the PCS program, as well as the STS's data on cardiothoracic procedures and mortality rates for hospitals nationwide.

On 5 December 2019, Plaintiffs filed a complaint in Orange County Superior Court against Dr. Mill; Dr. Ro; and two other doctors, Kevin Kelly, M.D., and Timothy Hoffman, M.D.; along with five unnamed individuals, identified as "John Doe 1-5." Plaintiffs asserted claims for constructive fraud and breach of fiduciary duty against all Defendants. The principal focus of Plaintiffs' complaint was an allegation that "[a]s a result of . . . Defendants' wrongful acts and omissions, Plaintiffs . . . were deceived and induced into allowing their gravely ill child[] to undergo surgery in

what was, unknown to them, one of the most dangerous pediatric cardiac surgery programs in the United States."

On 20 December 2019, Dr. Mill, Dr. Ro, Dr. Kelly, and Dr. Hoffman filed a joint motion to dismiss. On 10 July 2020, the trial court entered an order, *inter alia*, granting the motion in part and dismissing all claims against Dr. Kelly and Dr. Hoffman, but denying the motion as to Dr. Mill and Dr. Ro. Dr. Mill and Dr. Ro filed their answers on 30 July 2020, and the parties proceeded with discovery.

On 28 January 2021, the Chief Justice of our Supreme Court designated this case and two others pending against Dr. Mill as exceptional cases pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts. Chief Justice Paul Newby appointed the Honorable R. Allen Baddour, Jr., to preside over these cases.

Dr. Mill and Dr. Ro filed separate motions for summary judgment on 24 and 25 June 2024. In their motions, Dr. Mill and Dr. Ro asserted that they were entitled to summary judgment because, despite Plaintiffs' characterization of their claims as "constructive fraud" and "breach of fiduciary duty," Plaintiffs' action sounded in medical malpractice. As such, Dr. Mill and Dr. Ro contended that Plaintiffs' claims were barred because Plaintiffs failed to (1) comply with the mandatory certification requirements for medical-malpractice claims set forth by Rule 9(j) of the North Carolina Rules of Civil Procedure, and (2) timely file their action within the three-year statute of limitations applicable to medical-malpractice claims. *See* N.C. Gen.

Stat. § 1-15(c) (2023).

Each party submitted extensive documentary evidence before the summary judgment motions came on for hearing on 18 July 2024. On 23 July 2024, the trial court entered an order granting Dr. Mill's and Dr. Ro's motions for summary judgment and dismissing Plaintiffs' claims with prejudice as to all Defendants. Plaintiffs timely filed notice of appeal.

## II. Discussion

On appeal, Plaintiffs argue that the trial court erred by granting Dr. Mill's and Dr. Ro's motions for summary judgment because "Plaintiffs proffered evidence of each element of breach of fiduciary duty and constructive fraud." Plaintiffs also assert that the trial court erred to the extent that it concluded that Plaintiffs' claims sounded in medical malpractice. We disagree.

## A. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Gause v. New Hanover Reg'l Med. Ctr.*, 251 N.C. App. 413, 417, 795 S.E.2d 411, 415 (2016) (citation omitted). This Court reviews a trial court's grant of summary judgment de novo, "and evidence is viewed in the light most favorable to the non-moving party." *Id.* (citation omitted).

## B. Analysis

The dispositive issue in this appeal is whether Plaintiffs' claims sound in medical malpractice. If so, their claims were barred by Plaintiffs' failure to comply with Rule 9(j), and summary judgment was appropriately entered in favor of Defendants.

"Whether an action is treated as a medical malpractice action . . . is determined by our statutes," rather than the descriptor assigned by the author of a complaint. *Id.* at 418, 795 S.E.2d at 415 (citation omitted); *see also Bennett v. Hospice & Palliative Care Ctr. of Alamance-Caswell*, 246 N.C. App. 191, 192–95, 783 S.E.2d 260, 261–63 (reviewing a complaint to determine whether any of its claims fell within the statutory definition of a "medical malpractice action," notwithstanding the plaintiff's characterization of her various claims), *disc. review denied and appeal dismissed*, 368 N.C. 917, 787 S.E.2d 374 (2016).

"The statutory definition of medical malpractice is a broad one." *Gause*, 251 N.C. App. at 418, 795 S.E.2d at 415 (citation omitted). Our General Statutes provide, in relevant part, that a "medical malpractice action" is "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11(2)(a).

The crux of the present appeal is whether Plaintiffs' claims concern "the furnishing or failure to furnish professional services" by Dr. Mill and Dr. Ro. *Id.*

The term "professional services" is not defined by our

statutes but has been defined by this Court as "an act or service arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual."

*Gause*, 251 N.C. App. at 418, 795 S.E.2d at 415 (citation omitted). "Our courts have classified as medical malpractice those claims alleging injury resulting from activity that required clinical judgment and intellectual skill." *Id.* On the other hand, we "have classified as ordinary negligence those claims alleging injury caused by acts or omissions in a medical setting that were primarily manual or physical and which did not involve a medical assessment or clinical judgment." *Id.*

On appeal, Plaintiffs insist that their claims for breach of fiduciary duty and constructive fraud do not constitute claims for medical malpractice, as they do not allege that Dr. Mill and Dr. Ro "failed to describe the surgical procedure or failed to meet a standard of care. Rather, the claims are that [Dr.] Mill and [Dr.] Ro concealed/misrepresented their program quality and outcomes in an attempt to persuade [Plaintiffs] to have surgery at UNC." In response, Dr. Mill and Dr. Ro contend that Plaintiffs' "claims are medical malpractice claims" because "[w]hether to disclose that type of data in a discussion about the risks of a surgery is a matter of clinical judgment."

In their complaint, Plaintiffs based their constructive fraud claim on Defendants' alleged failure to provide them with sufficient information regarding the PCS program. Plaintiffs asserted that "[m]ortality data, complication rate, volumes

of procedures, outcomes, experience and success rate and physicians' concerns about a program's negative outcomes for patients are material facts for parents choosing pediatric cardiac surgery for their children." Similarly, Plaintiffs grounded their breach of fiduciary duty claim on Defendants' alleged "failure to disclose information to Plaintiffs about Defendants' concerns, and UNC's mortality, outcomes, safety, success and complication data for pediatric cardiac patients in an effort to persuade Plaintiffs to schedule Skylar for surgery at UNC."

In their joint appellate brief, Dr. Mill and Dr. Ro respond that "the services at issue are disclosures of mortality data in discussions about the risks of a surgery" and that these "are professional services" because "[w]hen a doctor decides whether to disclose mortality data in discussions about the risks of a surgery, the doctor needs to use her clinical judgment and intellectual skill." Dr. Mill and Dr. Ro explain that the "mortality data here covers hundreds of surgeries of different types and complexities" and that "[m]ortality rates vary for different categories of surgeries." Dr. Mill and Dr. Ro persuasively explain how the decision to provide mortality rates regarding a particular surgery to a particular patient implicates a doctor's clinical judgment:

> [T]o decide whether to tell a patient about the mortality rate for the surgeries in any particular category, a doctor must decide whether that mortality rate is relevant to the surgery at issue. That decision requires clinical judgment about the surgeries in the different categories and how they relate to each other.

. . . .

> [W]hether mortality rates for highly complex STAT [Level] 5 surgeries are relevant to the risks of a minimally complex STAT [Level] 1 surgery is a question that requires medical analysis and judgment.

Dr. Mill and Dr. Ro further note that the deposition testimony of both parties' experts supports this point. For example, one of Plaintiffs' expert witnesses agreed that it was not "the duty of every congenital heart surgeon to share with patient families overall complication rates for all surgeries in the program . . . regardless of the surgery to be performed" because the STS database contains hundreds of different surgical procedures, and "complication rates vary widely between the different kinds of congenital heart surgeries." The expert also agreed that he discouraged "overestimat[ing] the risk of the congenital heart surgery" that a child needed because it was "terrifying [to] the patients."

Indeed, one of the expert witnesses for the defense testified that "sometimes you can include everything under the sun to discuss [with] a parent, but there is such a thing as a reality of limited time to discuss and to explain things." He explained that "we refer patients on a case-by-case basis and [do] not conveniently put them in a category and decide where they should go for surgery"; that "there are many nuances of patients and situations that are not reflected in the collection of data, assuming dat[a] collection is accurate, and that one has to interpret the STS database with that in mind"; that the volume of various PCS programs "makes the statistics

sometimes very difficult to interpret"; and that "the point of the data in the database" was "not necessarily" to provide "a basis for referral of patients." By way of example, this expert observed that "sometimes surgeons change, programs change, units change. And you don't always get that information when you look at a database." The STS database, he added, is "simply reflecting the output without any sort of attention paid to . . . the type of input."

Another defense expert further articulated how interpreting mortality rates within STAT categories "require[s] medical personnel to use clinical judgment and intellectual skill" on a case-by-case basis—activity that our courts have consistently held supports a claim for medical malpractice where injury arises. *Id.* at 420, 795 S.E.2d at 416. This expert explained that "there are a number of procedures within each STAT category. Some that are completely different operations, completely different heart lesions, that have potentially no relevance whatsoever to the outcome of the individual procedure you're performing." Because there are a "[d]ifferent set of complications" and "[d]ifferent set of risks" for each procedure, the expert did not "believe that outcomes within a STAT category . . . are necessarily relevant to what you would tell a family."

Our careful review of the record indicates that the determination of whether and how to provide the information and data at the core of Plaintiffs' claims clearly "involves specialized knowledge and skills which are predominantly mental or intellectual." *Id.* The allegations underlying Plaintiffs' claims thus concern "the

furnishing or failure to furnish professional services" by Dr. Mill and Dr. Ro. N.C. Gen. Stat. § 90-21.11(2)(a). Although Plaintiffs framed their claims in the language of breach of fiduciary duty and constructive fraud, their action nevertheless sounds in medical malpractice as broadly defined by § 90-21.11(2)(a) and our case law that has interpreted it. *See Gause*, 251 N.C. App. at 418, 795 S.E.2d at 415; *Bennett*, 246 N.C. App. at 192–95, 783 S.E.2d at 261–63.

Consequently, Plaintiffs' claims are subject to the pleading requirements of Rule 9(j), which mandates their dismissal. Under Rule 9(j), "medical malpractice actions cannot be brought without prior review of the medical care and relevant medical records by a person reasonably expected to qualify as an expert and to testify that the defendant provided substandard care." *Gause*, 251 N.C. App. at 418, 795 S.E.2d at 415; N.C. Gen. Stat. § 1A-1, Rule 9(j)(1)–(2). "Failure to allege compliance with Rule 9(j) in a complaint for medical malpractice requires dismissal." *Gause*, 251 N.C. App. at 418, 795 S.E.2d at 415.

Plaintiffs' complaint did not comply with Rule 9(j). Dr. Mill and Dr. Ro are thus "entitled to a judgment as a matter of law." *Id.* at 417, 795 S.E.2d at 415 (citation omitted). Accordingly, the trial court did not err by granting Dr. Mill's and Dr. Ro's motions for summary judgment and dismissing Plaintiffs' claims with prejudice.

### III.    Conclusion

For the foregoing reasons, we affirm trial the court's order.

AFFIRMED.

Judges TYSON and COLLINS concur.